## SEACOAST PRODUCTS, INC., Appellant,

v.

## SPRING VALLEY FARMS, INC., Appellee.

Nos. C-83-697-G, B-82-02023C-11.

United States District Court,
M.D. North Carolina,
Greensboro Division.

Oct. 25, 1983.

Michael W. Patrick and George W. Miller, Jr. of Haywood, Denny & Miller, Chapel Hill, N.C., for plaintiff.

Jerry G. Tart, of Dees, Johnson, Tart, Giles & Tedder, Greensboro, N.C., William B. Sullivan of Arent, Fox, Kintner, Platkin & Kahn, Washington, D.C., for defendant.

### MEMORANDUM ORDER

HIRAM H. WARD, Chief Judge.

This matter comes before the Court on the Appeal (July 26, 1983) by Seacoast Products, Inc. (Seacoast) of the Bankruptcy Court's Order and Memorandum Opinion entered June 30, 1983. Following remand by this Court of this matter to the Bankruptcy Court for further proceedings, that court conducted a hearing on April 25, 1983, to determine if Spring Valley Farms, Inc. (Spring Valley), the debtor-in-possession, should be allowed pursuant to 11 U.S.C. § 365 to assume a contract entered into by Spring Valley and Seacoast in July, 1982. In its Memorandum Opinion the Bankruptcy Court made findings as to the executory nature of the contract and the adequate assurances issues. The court concluded that Spring Valley may assume the contract. It also concluded that it had jurisdiction to entertain Spring Valley's application to assume the contract pursuant to 11 U.S.C. § 365. The parties agree that the standard

of appellate review is set out in Standing Order No. 6(e)(2)(B).

In conducting review, the district judge may hold a hearing and may receive such evidence as appropriate and may accept, reject, or modify, in whole or in part, the order or judgment of the bankruptcy judge, and need give no deference to the findings of the bankruptcy judge. At the conclusions of the review, the district judge shall enter an appropriate order or judgment.

The parties offered oral arguments at the hearing before the Court on October 21, 1983.

Seacoast's contention that the Bankruptcy Court lacked jurisdiction to decide the application of Spring Valley to assume the contract is based on the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). It contends that since the Bankruptcy Court had to determine an issue of state law, *i.e.*, whether Seacoast exercised its option to terminate the contract, the court lacked jurisdiction. Furthermore, Seacoast argues, alternatively, that Standing Order No. 6 does not authorize the Bankruptcy Court to pass on the application, that the Standing Order is invalid, and that the District Court lacks jurisdiction in bankruptcy.

Section (c)(1) of Standing Order No. 6 refers "[a]ll cases under Title 11 and all civil proceedings arising under Title 11 or arising in or related to cases under Title 11 . . ." to the Bankruptcy Court. "Related proceedings" are defined at section (d)(3)(A) as "civil proceedings that, in the absence of a petition in bankruptcy, could have been brought in a district court or a state court." Contested matters concerning the administration of the estate are not related proceedings. Section (d)(3)(A) also provides that "[a] proceeding is not a related proceeding merely because the outcome will be affected by state law."

The question of whether Spring Valley may assume the contract is not a question of state law, but is a matter of a right provided to a debtor pursuant to federal bankruptcy law, 11 U.S.C. § 365. The standard of review agreed upon by the parties is tacit recognition of this fact. *Northern Pipeline* dealt with a matter arising solely under state law. Justice Rehnquist phrased this fact in his concurring opinion as follows: "The lawsuit is before the Bankruptcy Court only because the plaintiff has previously filed a petition for reorganization in that Court." 458 U.S. at 90, 102 S.Ct. at 2881. Furthermore, *Northern Pipeline* did not affect the District Court's jurisdiction in bankruptcy matters under 28 U.S.C. §§ 1471(a) and (b). Also, the grant of jurisdiction to the District Courts over all matters in bankruptcy found at 28 U.S.C. § 1334 is still effective. *White Motor Corp. v. Citibank, N.A.*, 704 F.2d 254, 260–261 (6th Cir.1983); *Braniff Airways, Inc. v. Civil Aeronautics Board*, 700 F.2d 214 (5th Cir.), cert. denied, —— U.S. ——, 103 S.Ct. 2122, 77 L.Ed.2d 1302 (1983).

In the aftermath of *Northern Pipeline* and congressional inaction, the various District Courts adopted an interim rule for the handling of matters involved in or related to bankruptcy proceedings. In this District that rule is Standing Order No. 6. The constitutionality of the interim rule has been upheld. *White Motor Company v. Citibank, N.A.*, 704 F.2d at 263. The Bankruptcy Court and this Court have jurisdiction to entertain Spring Valley's application to assume the contract.

Seacoast also challenges the Bankruptcy Court's conclusions that adequate assurances have been given that the pre-petition debt of $107,725.68 will be promptly cured and that Spring Valley will perform its contract obligations in the future. The Bankruptcy Court concluded that the former issue was moot because Spring Valley paid off the pre-petition debt in March, 1983. It challenges comprehension to understand why, as Seacoast urges, Spring Valley must present evidence at the hearing in April, 1983, that it is able or was able to promptly cure the default. The capacity to cure is self-evident.

Seacoast contends that the evidence does not support the Bankruptcy Court's ruling that Spring Valley gave adequate assurance of future performance. A guarantee by a solvent third party or a showing of favorable market conditions are not the sole methods of showing adequate assurance of future performance. This determination must be made on a case by case basis. The Court is satisfied that the Bankruptcy Court's findings on this matter are sound.

Charles J. Preston, Spring Valley's controller and formerly its manager of planning and analysis, testified that he keeps a daily accounting of cash funds available to Spring Valley for the payment of bills. Transcript at 7 (June 13, 1983). He states that on the date of the hearing, April 25, 1983, Spring Valley had $700,000 in cash for bills and could have $1,200,000 by the close of business. Transcript at 8. He testified that the market outlook for May, June, and July was favorable and that the net worth of the group of debtors of which Spring Valley was a member was $16,000,000. Transcript at 9–10. Donald E. Graham, Spring Valley's cash commodity manager/procurement manager, testified that the debtor has promptly paid for all shipments and has paid over $635,000 for tonnage since December 29, 1982, as well as the pre-petition debt. Transcript at 21. Moreover, these payments to Seacoast for fishmeal since December 29, 1982, have been at the substantially higher market rate. (At this time, Seacoast has completed delivering to Spring Valley the total tonnage at the market rate). A review of the record confirms the soundness of the Bankruptcy Court's conclusion on this point.

Seacoast's final contention is that the Bankruptcy Court erred in concluding that the contract was executory. The court concluded that the contract was executory for purposes of section 365 because Seacoast had made no attempt to terminate it prior to November 7, 1982, the date Spring Valley filed its Chapter 11 petition. In order for Spring Valley as the debtor-in-possession to be able to assume the contract, the contract must not have "expired by its own terms or [have] been terminated *prior to the commencement* of the bankruptcy case . . . ." 2 *Collier on Bankruptcy* ¶ 365.02 at 365–13 (15th ed. 1983) (emphasis added).

Seacoast does not contend that it terminated or cancelled the contract prior to November 7. Rather, it contends that it terminated the contract on November 16 pursuant to its authority under paragraph 6 of the contract. (Paragraph 6 gives Seacoast the option of suspending shipments or terminating the contract upon Spring Valley's default). The Bankruptcy Court did not address this issue.

Section 365(d)(2) provides that in a case under Chapter 11, the trustee may assume an executory contract "at any time before confirmation of a plan, but the court, on request of any party to such contract . . . , may order the trustee to determine within a specified period of time whether to assume . . . such contract . . . ." Section 365(e)(1) provides that an executory contract may not be terminated or modified at any time after the commencement of the case solely because of the presence in the contract of a so-called *ipso facto* bankruptcy termination clause, *i.e.,* a clause making the filing of a bankruptcy petition a release of the non-debtor from further obligations on the contract. Seacoast relies heavily on section 365(e)(1). It argues that this section gives tacit approval of termination on other grounds after the filing of a petition in bankruptcy.

Section 365(e)(1) was enacted as remedial legislation to stop forfeitures of contractual rights pursuant to such clauses as was allowed under the prior Bankruptcy Act. 2 *Collier on Bankruptcy* ¶ 365.06. Section 365(e)(1) is not authority for the proposition that Seacoast can terminate its contract with Spring Valley because of the latter's curable default. One of the central purposes of section 365 is to provide debtors with a mechanism to preserve executory contracts despite their defaults. The right to cure under section 365(b)(1) is a significant new aspect of the new Code without prior counterpart. 2 *Collier on Bankruptcy*

¶ 365.04[1]. Spring Valley promptly sought to exercise its rights under section 365.

Seacoast contends that paragraph 6 gave it the right to terminate the contract despite the filing of the bankruptcy petition. "[T]he assumption of an executory contract requires the trustee to take the contract as he finds it subject to both benefits and burdens." 2 *Collier on Bankruptcy* ¶ 365.04 at 365–28. Under the prior Act, the "trustee's decision to adopt . . . a contract following the filing of a bankruptcy petition does not preclude the exercise of the other party's pre-existing right to terminate the agreement." *Schokbeton Industries, Inc. v. Schokbeton Products Corp.,* 466 F.2d 171, 175 (5th Cir.1972).

As noted earlier the right to cure is without counterpart under the prior Act. Section 365(a) clearly provides that the trustee may assume an executory contract. Section 365(b) just as clearly provides that he may assume an executory contract even if there has been a default by the debtor—provided that at the time of assumption he cures the default or gives adequate assurances of a prompt cure, among other things. This provision appears to grant the trustee the power to avoid the non-debtor's right under state law to terminate the contract provided the contract is executory at the time the bankruptcy petition is filed and the trustee can adequately cure the default.

■ A review of the record shows that Seacoast *never* exercised its power under paragraph 6 to terminate the contract because of Spring Valley's pre-petition default. Testimony by Glenn Speakman, a Seacoast vice-president, shows that Seacoast was worried that Spring Valley would not be able to take out the balance of 3,000 tons under the contract because of its poor financial situation. Transcript at 54. Speakman testified that he and Donald Graham, Spring Valley's procurement manager, negotiated a new contract for only 1,000 tons at a price below the market price but in excess of the original contract's price and that the two agreed to cancel the original contract. Transcript at 57–59 and Exhibit 1. Graham denied agreeing to a cancellation. Even if Graham agreed to the cancellation, this action was ineffective because the debtor-in-possession may not reject an executory contract without the Bankruptcy Court's approval. 11 U.S.C. § 365(a); *see also* 5 *Collier on Bankruptcy* ¶¶ 1107.02 at 1107–5 and 1108.03 at 1108–4— –5 (1983).

IT IS, THEREFORE, ORDERED that the Bankruptcy Court's Order of June 30, 1983, be, and the same hereby is, ACCEPTED.