In re CHILD WORLD, INC., Debtor.

CHILD WORLD, INC., Appellant,

v.

The CAMPBELL/MASSACHUSETTS TRUST, Appellee.

Bankruptcy No. 92 B 20887 (HS).
No. 93 Civ. 4806 (GLG).

United States District Court,
S.D. New York.

Nov. 29, 1993.

Weil, Gotshal & Manges (Pamela B. Corrie, of counsel), New York City, for debtor–appellant.

Foley, Hoag & Eliot (Andrew Z. Schwartz, of counsel), Boston, MA, for appellee.

## *OPINION*

GOETTEL, District Judge.

This matter is before this court on an appeal taken by Child World, Inc. ("Child World"), the Chapter 11 debtor, from an order of the bankruptcy court (the "Order") dated March 16, 1993 requiring Child World to pay timely to the Campbell/Massachusetts Trust (the "Trust"), the landlord under a lease with Child World, certain tax-related obligations under said lease. In addition, Child World is appealing an order of the bankruptcy court dated May 21, 1993 denying its motion to reconsider the Order and to amend the findings of fact issued by the bankruptcy court in its decision (the "Decision"), 150 B.R. 328 (Bankr.S.D.N.Y.1993), accompanying the Order.

Eleven U.S.C. § 365(d)(3) creates a special priority among creditors for landlords by requiring debtor-tenants to pay timely their obligations under leases of nonresidential real property during the period after the debtor-tenants have filed their bankruptcy petition, and before they have either rejected or assumed their leases.[1] The issue in this appeal is whether § 365(d)(3) requires debtor-tenants to pay timely all lease obligations billed during the postpetition, prerejection period, regardless of whether the items billed relate in part to the prepetition period, or whether the courts should prorate debtor-tenants' lease obligations to cover only the postpetition, prerejection period. The Trust contends that the plain meaning of § 365(d)(3) compels the former result, while Child World argues that proration is required to ensure that landlords do not receive more than Congress intended, to the detriment of other creditors.

## FACTS

The essential facts relevant to this appeal are not in dispute. On May 6, 1992, Child World filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code and was authorized to operate its business and manage its properties as a debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. Child World anticipates the complete liquidation of its business and therefore has either sold or rejected its unexpired business leases.

The lease in question in this appeal (the "Lease") was entered into on February 27, 1989 between Cmane–Hyannis Retail Limited Partnership ("Hyannis") and Child World, and involves approximately 36,416 square feet of retail space at the Hyannis Festival Shopping Center in Hyannis, Massachusetts. Subsequently, Hyannis assigned its lessor's interest in the Lease to the Trust.

Child World's rent under the Lease consisted of a monthly base charge, a percentage of gross profits, and Child World's proportionate share of the net amount of all real estate taxes and assessments levied and assessed against the shopping center. The Lease directs Child World to pay its share of the taxes within fifteen days after the Landlord submits proof of payment of taxes, a bill for Child World's share and a statement describing how Child World's share was calculated.

On June 15, 1992, more than five weeks after the petition date, the Trust submitted to Child World its proof of payment of the real estate taxes assessed for the second half of fiscal year 1992, namely, the period from January to June of 1992, and enclosed a bill for Child World's share, which amounted to $47,451.46. This was in accordance with the customary practices of Child World and the Trust.

Child World did not consider itself legally bound to timely reimburse the Trust for real estate taxes which arose during the prepetition period. Accordingly, Child World only reimbursed the Trust for its share of the real

---

1. For convenience, this will be referred to as the "postpetition, prerejection period," rather than the more cumbersome, albeit more accurate, "postpetition, prerejection or assumption period."

estate taxes arising during the postpetition, prerejection period.

On September 4, 1992, an order was entered granting Child World's motion to reject the Lease, thus bringing to an end the period to which § 365(d)(3) applies.

## DECISION OF THE BANKRUPTCY COURT

The bankruptcy court, in its Decision accompanying the order requiring Child World to pay timely its share of the real estate taxes, determined that Child World's obligation under the Lease to reimburse the Trust for taxes was an integral component of its obligation to pay rent under the Lease. Furthermore, the court determined that under the Lease Child World's reimbursement was due and owing by June 30, 1992, fifteen days after the Trust submitted its bill to Child World. Thus, the court found that Child World's obligation to reimburse arose after the petition date of May 6, 1992 and before the rejection date of September 4, 1992. Since the court interpreted § 365(d)(3) as providing that the billing date in the lease determines when an obligation arises, the court held that Child World was required to reimburse the Trust for the full amount of the real estate taxes arising from the period from January to June of 1992, regardless of the fact that most of this period fell prepetition.

2. The Trust has moved to strike Child World's Reply Brief as untimely. Child World admits that its Reply Brief is technically late, but has requested by letter dated September 29, 1993, the day the brief was filed, that this court accept the brief regardless.

The Trust contends that Federal Rule of Bankruptcy Procedure 8011(a) requires such requests for consideration of late briefs to be made by filing a motion. We do not read Rule 8011(a) as imposing such a requirement.

Since oral arguments in this appeal were held on October 29, 1993, a month after Child World filed its Reply Brief, we cannot see what prejudice the Trust has suffered due to Child World's late submission. We accept Child World's Reply Brief, and deny the Trust's motion to strike the brief.

3. Section 6.01 of the Lease provides, in pertinent part:

## ANALYSIS

■ The bankruptcy court's legal conclusions are reviewed *de novo* by the district court. *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988 (2d Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991).

■ In conducting our review, we begin, of course, with the language of the controlling statute.[2] 11 U.S.C. § 365(d)(3) provides in relevant part:

The trustee shall timely perform all the obligations of the debtor ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title [which allows for first priority administrative expenses, including the actual, necessary costs of preserving the estate, as well as taxes incurred by the estate].

Unexpired leases must be assumed or rejected within sixty days of the order for relief, at which time they are automatically deemed rejected, unless the court grants additional time. 11 U.S.C. 365(d)(4).

The parties have focussed their disagreement on the interpretation of the word "obligations." The Trust argues that since the Lease does not require Child World to make any tax-related payments to the Trust until the Trust sends a bill,[3] Child World had no obligation under § 365(d)(3) to reimburse the Trust until the Trust sent the bill.[4] Since in

(b) Tenant shall be liable for and shall pay its share of Taxes only with respect to Taxes in respect of the term of this Lease, regardless of when such Taxes are billed or become due and payable. Tenant shall pay its proportionate share of such Taxes within fifteen (15) days after Landlord submits to Tenant proof of payment of Taxes by Landlord, a tax bill for such Taxes and a statement setting forth the manner in which Tenant's proportionate share of Taxes is calculated or ten (10) days before the same are due and payable, whichever is later.

4. In support of this proposition, the Trust cites several Massachusetts cases on interpreting lease provisions. We do not think that such state caselaw of general application, especially when it dates from the nineteenth century, has much relevance to the application of a 1984 amendment to the Bankruptcy Code. None of the cases we have found that apply § 365(d)(3) to lease

the instant case the Trust sent the bill during the postpetition, prerejection period, the argument goes, the bill is a postpetition obligation which must be timely paid, even though much of the taxes for which reimbursement was sought arose prepetition.

Child World maintains that their obligation to reimburse the Trust for real estate taxes arose when the taxes accrued against the Trust, which was largely prepetition. In their view, they had an unmatured, prepetition obligation to reimburse the Trust for prepetition real estate taxes. Child World argues that the Bankruptcy Code recognizes such unmatured obligations, citing the Code's definition of a "claim," (which, they assert, is the corollary to an "obligation") as a *"right to payment,* whether or not such right is reduced to judgment, liquidated, *unliquidated,* fixed, *contingent,* matured, *unmatured,* disputed, undisputed, secured, or unsecured...." 11 U.S.C. § 101(5)(A) (emphasis added). Black's Law Dictionary states that obligation is "[a] generic word ... having many, wide, and varied meanings, according to the context in which it is used." 6th ed. 1993. We conclude that § 365(d)(3) is ambiguous as to when a debtor-tenant's obligation under a lease to reimburse the landlord for real estate taxes arises. Consequently, we must examine the legislative history to discern Congress' intent. *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

The legislative history provides compelling evidence that Congress did not intend § 365(d)(3) to include debtor-tenants' rental obligations arising prepetition, but billed postpetition. To better understand § 365(d)(3), it is useful to consider the state of the law prior to its enactment.

Prior to the enactment of § 365(d)(3) as part of the 1984 amendments to the Bankruptcy Code, debtor-tenants' lease obligations in the postpetition, prerejection period were handled under the general statute for administrative expenses, 11 U.S.C. § 503.

This provision allows the bankruptcy court, after a request, notice, and hearing, to declare certain payments "administrative expenses." Administrative expenses include "the actual, necessary costs and expenses of preserving the estate" as well as certain taxes incurred by the estate. 11 U.S.C. § 503(b)(1). Administrative expenses are given priority over all other unsecured claims. 11 U.S.C. § 507.

The policy behind this statutory scheme is to

> facilitate the efforts of the trustee or debtor in possession to rehabilitate the business for the benefit of all the estate's creditors. Congress reasoned that unless the debts incurred by the debtor in possession could be given priority over the debts which forced the estate into bankruptcy in the first place, persons would not do business with the debtor in possession, which would inhibit rehabilitation of the business and thus harm the creditors.

*Trustees of Amalgamated Insurance Fund v. McFarlin's, Inc.,* 789 F.2d 98, 101 (2d Cir. 1986) (citations omitted). The same court also stated that "[b]ecause the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed." *Id.* at 100; *accord Joint Industry Board v. United States,* 391 U.S. 224, 228, 88 S.Ct. 1491, 1494, 20 L.Ed.2d 546 (1968); *In re Mammoth Mart, Inc.,* 536 F.2d 950, 953 (1st Cir.1976).

In applying § 503(b)(1) to a debtor-tenant's rental obligations before the 1984 amendments, the courts would ordinarily allow as an administrative expense the full amount of the rent, as long as it was not clearly unreasonable, prorated over the postpetition, prerejection period. *See Palmer v. Palmer,* 104 F.2d 161, 163 (2d Cir.), *cert. denied,* 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494 (1939); *In re Dunwoody Village Sporting Goods, Inc.,* 11 B.R. 493, 494 (Bankr.

provisions such as the one at issue here make any mention of such state caselaw. The one case cited by the Trust in support of their argument that we should examine Massachusetts contract law simply looked to state cases to determine whether a particular lease provision sought to be

enforced under § 365(d)(3) was permissible under state law. *See In re Washington Bancorporation,* 126 B.R. 130, 130 (Bankr.D.D.C.1991). That issue has not been raised in the instant appeal.

N.D.Ga.1981); *In re Keyboard Center, Inc.,* 9 B.R. 472, 474 (Bankr.D.Conn.1981); *In re Standard Furniture Co.,* 3 B.R. 527, 529–30 (Bankr.S.D.Cal.1980); 3 *Collier on Bankruptcy* ¶ 503.04, pp. 503–15, 16 (15th ed. 1980). Indeed, when the lease required the debtor-tenant to reimburse the landlord for real estate taxes, as in the instant case, the courts would only allow as an administrative expense real estate taxes accruing during the postpetition, prerejection period, regardless of when they were billed. *See In re J. Bain, Inc.,* 554 F.2d 255 (5th Cir.1977); *In re Lackow Brothers, Inc.,* 18 B.R. 770, 772 (Bankr. S.D.Fla.1982); *In re Keyboard Center,* 9 B.R. at 475; *In re CRS Architectural Metals Corp.,* 1 B.R. 729, 732 (Bankr.E.D.N.Y.1979).

 Bankruptcy courts have broad discretion over the timing of payment of administrative expenses. *In re Photo Promotion Associates, Inc.,* 881 F.2d 6, 8–9 (2d Cir. 1989). Often in Chapter 11 cases, administrative expenses are not required to be paid until confirmation. *In re Appletree Markets Inc.,* 139 B.R. 417, 419 (Bankr.S.D.Tex.1992).

Section 365(d)(3) created an explicit exception to the existing procedures for determining administrative expenses under § 503(b)(1).[5] Senator Hatch, who was a conferee on the 1984 amendments, gave a detailed explanation of Congress' reasons for creating this exception:[6]

> This subtitle contains three major substantive provisions which are intended to remedy serious problems caused shopping centers and their solvent tenants by the administration of the bankruptcy code.
>
> . . . . .
>
> A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease. These payments include rent due the landlord and common area charges which are paid by all the tenants according to the amount of space they lease. In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor.
>
> This bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease.

*H.R.Conf.Rep. No. 882, 98th Cong., reprinted in* 1984 U.S.Code Cong. & Admin.News 576.

Section 365(d)(3) altered the existing law for nonresidential leases by fixing the amount to be paid by debtor-tenants pending assumption or rejection of the lease at the amount provided in the lease, thus removing the bankruptcy courts' power to review the terms of the lease for reasonableness, and by requiring these payments to be paid "at the time required in the lease." These alterations were intended, in Senator Hatch's words, to ensure that landlords received "current payment" for their "current services." Nothing in the legislative history indicates that Congress intended § 365(d)(3) to

---

**5.** Most courts have characterized payments due under § 365(d)(3) as "administrative expenses." However, the court in *In re Duckwall–Alco Stores, Inc.,* 150 B.R. 965 (D.Kan.1993) declined to follow this practice in light of the differences in amount and timing between payments due under § 365(d)(3) and payments allowed as administrative expenses under § 503. *Id.* at 971 n. 10. Given the differences between § 365(d)(3) and § 503 noted by the *Duckwall* court, as well as the different purpose of § 365(d)(3), as described in Senator Hatch's statement, we agree that characterizing payments due under § 365(d)(3) as "administrative expenses" is confusing, and therefore we follow the lead of the *Duckwall* court in declining to use the common terminology.

**6.** No Senate report or House report was submitted with the legislation, nor did the House conference report contain a joint explanatory statement. All we find in the Congressional Record are statements by legislators. Senator Hatch was apparently the only legislator to address what would become § 365(d)(3).

overturn the long-standing practice under § 503(b)(1) of prorating debtor-tenants' rent to cover only the postpetition, prerejection period, regardless of billing date.

■ Moreover, the logic of requiring debtor-tenants to pay for the "current services" their landlords must provide during the postpetition, prerejection period dictates that to the extent such payments consist of rent, they should be prorated to cover only the postpetition, prerejection period. Allowing landlords to recover for items of rent which are billed during the postpetition, prerejection period, but which represent payment for services rendered by the landlord outside this time period, would grant landlords a windfall payment, to the detriment of other creditors, without any support from the legislative history. This conclusion is reinforced by the policy of narrowly construing statutory priorities in order to treat creditors as equally as possible, as discussed above.

A substantial majority of the courts that have considered the issue in this case have concluded that under § 365(d)(3), rent should be prorated to cover only the postpetition, prerejection period, regardless of the fortuity of the billing date. *See In re Ames Department Stores, Inc.,* 150 B.R. 107 (Bankr. S.D.N.Y.1993); *In re RB Furniture, Inc.,* 141 B.R. 706, 712 (Bankr.C.D.Cal.1992) ("Debtor was not free to pay the prepetition part of the tax without violating the statutory distribution scheme in the Code."); *In re Ames Department Stores, Inc.,* 136 B.R. 353 (Bankr.S.D.N.Y.1992); *In re Duckwall–Alco Stores, Inc.,* 1992 WL 365326 (D.Kan.1992); *In re Hills Department Stores Co.,* 91 B 10488´ (TLB) (Bankr.S.D.N.Y. July 23, 1991); *In re Revco D.S., Inc.,* 111 B.R. 626 (Bankr. N.D.Ohio 1989); *In re Swanton Corp.,* 58 B.R. 474 (Bankr.S.D.N.Y.1986); *In re S & F Concession, Inc.,* 55 B.R. 689 (Bankr.E.D.Pa. 1985); *In re Barrister of Delaware, LTD.,* 49 B.R. 446 (Bankr.D.Del.1985); *see also In re Vause,* 886 F.2d 794 (6th Cir.1989) (different statute but similar reasoning: 11 U.S.C. § 502(b)(6), which limits lessor's recovery under rejected lease to "unpaid rent due under such lease," requires proration in case of rent

payable in single annual payment at end of year, where rejection occurred four days before due date). *But see In re R.H. Macy & Co., Inc.,* 152 B.R. 869 (Bankr.S.D.N.Y.1993), *appeal docketed,* No. 93–4414 (S.D.N.Y. June 29, 1993); *In re Duckwall–Alco Stores, Inc.,* 150 B.R. 965, 975 (D.Kan.1993); *In re Appletree Markets, Inc.,* 139 B.R. 417 (Bankr. S.D.Tex.1992).

Those few courts which have interpreted § 365(d)(3) as providing that the billing date determines when lease obligations arise have produced results which, given the legislative history, we cannot believe were intended by Congress. In *Macy,* 152 B.R. 869, a case similar to the instant situation, the court held that a debtor-tenant which filed its petition in January 1992 was required to pay timely a postpetition bill from its landlord seeking reimbursement for $438,000 in real estate taxes relating to 1987 through 1992, a period which was almost entirely prepetition. It is difficult to see how such a payment could be considered compensation for the "current services" the *Macy* landlord was required to provide in the postpetition, prerejection period.

Another decision which relied upon the billing date to determine when obligations arise under § 365(d)(3) resulted in a windfall to the debtor-tenant, rather than the landlord. In *Appletree,* 139 B.R. 417, the court held that monthly, quarterly, and annual rent falling due, under the terms of the lease, one day before the debtor filed its petition, but relating almost entirely to the postpetition period, did not have to be paid at all. Following the logic of this case, if the debtor-tenant's rent consisted of a single annual payment, and this payment did not come due during the postpetition, prerejection period, the landlord would receive nothing from the debtor-tenant under § 365(d)(3) pending assumption or rejection of the lease. This is not what Congress had in mind when it acted to ensure that landlords received timely payment for the services they are forced to provide pending assumption or rejection of the lease.[7]

---

7. Child World is also appealing the bankruptcy court's refusal to amend the findings of fact it

issued in connection with the Decision. We do

## CONCLUSION

The legislative history makes clear that Congress did not intend for courts applying § 365(d)(3) to rely mechanically on the billing date in determining which postpetition, pre-rejection obligations under nonresidential leases must be timely paid. A substantial majority of the courts that have examined this issue have come to the same conclusion. Accordingly, the decision of the bankruptcy court in *In re Child World, Inc.,* 150 B.R. 328 (Bankr.S.D.N.Y.1993) is reversed, and the case remanded for further proceedings consistent with this decision. The Trust's motion to strike Child World's Reply Brief is denied.

**SO ORDERED.**

See also 159 B.R. 396.

not reach this issue, however, since we agree with Child World on the merits.